IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 2, 2021 Session

**DARIUS JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 12-01056    Lee V. Coffee, Judge
_____

**No. W2019-02186-CCA-R3-PC**
_____

The petitioner, Darius Jones, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial and on appeal. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and TIMOTHY L. EASTER, JJ., joined.

David Mays, Memphis, Tennessee, for the appellant, Darius Jones.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

***Procedural and Factual History***

I.    **Trial Proceedings**

A Shelby County jury convicted the petitioner of second-degree murder, first-degree felony murder, especially aggravated kidnapping, reckless endangerment, and two counts of aggravated kidnapping. Tenn. Code Ann. §§ 39-13-103; -202(a)(2); -210(a)(1); -302(a); 304(a)(5); -305(a)(1). The trial court imposed a sentence of life plus forty-nine years, eleven months, and twenty-nine days, and the petitioner appealed. Upon its review, this

Court affirmed the petitioner's convictions and summarized the facts of the petitioner's crimes, as follows:[1]

> The [petitioner's] convictions arose from the April 11, 2011 murder of the victim, Cortessa Chambers, at her home in Memphis. The victim died from a single gunshot wound to the head. At trial, the [petitioner] conceded that he shot the victim but insisted that the killing was accidental and was the result of a struggle between the victim, the [petitioner], and the victim's mother, Berthine Chambers.[2]

> At trial, Ms. Chambers testified that the victim was the eldest of her four children and that on April 11, 2011, Ms. Chambers was living on Lagena Street with her four children and four grandchildren. Two of the grandchildren living with her were the victim's children, a girl, who was twenty-two months old, and a boy, who was three years old at the time. She additionally testified that the victim was dating the [petitioner] at the time, that he was not the father of either of the victim's children, and that the [petitioner] had been staying at the Lagena Street house for the past three or four months. Ms. Chambers stated that the [petitioner] was also known by the nicknames "Day-Day" and "Bear."

> . . . .

> Andrea Nichols testified that she and the victim were childhood friends. She testified that in April 2011, the victim had been dating the [petitioner], whom she knew by the nickname "Bear." When asked to describe generally the relationship between the [petitioner] and the victim, she stated that she could only judge the relationship based on what the victim had told her, which was that "[the] [petitioner] was going to kill [the victim] and that [they] had been fighting." According to Ms. Nichols, the victim was upset when she related this information to Ms. Nichols, and the victim had been telling her about problems with the [petitioner] "during the whole month of April."

> . . . .

---

[1] The proof presented at trial and this Court's summary of the same was extensive. Thus, we have only included the portions of our prior summary which are relevant to the issues on appeal.

[2] All references to "Ms. Chambers" in this opinion refer to the victim's mother, Berthine Chambers.

- 2 -

Ms. Chambers testified that on April 11, 2011, the victim had plans to go to the store with Ms. Nichols. Sometime between 11:00 a.m. and noon, the victim entered Ms. Chambers's bedroom and asked to borrow an ink pen. The victim went back into her own bedroom and five to ten minutes later, re-entered Ms. Chambers's bedroom with a note in her hand. According to Ms. Chambers, the victim "was nervous, . . . and shaking and stuff," and the [petitioner] was standing in the doorway to the bedroom "demanding [the victim] . . . give [Ms. Chambers] the letter" and cussing the victim. Ms. Chambers "snatched the paper out of [the victim's] hand" and set it on the dresser. During trial, the State entered the letter into evidence. The letter read as follows:

To Whom This May Concern:

> Everyone know it's nothing like understanding. Me and [the victim] have argued, fought and everything else since we been together. I have told her everything about me, [a]ll my deepest secret[s] and everything. When she gets high she forget who I am and what I am capable of. I told her several time[s] what this would lead to if she did not honor my wishes. As for her family, they all know her condition. I am very tired of every one calling my bluff. I always say what I mean and mean what I say[.] I have no other choice. She took $100,000 from me and laughed[.]

Next, the victim said that she was going to the store and asked Ms. Chambers whether she needed anything. Ms. Chambers heard Ms. Nichols honk her horn outside the house, and the victim left.

Ms. Nichols testified that on April 11, 2011, she went to Ms. Chambers's house to take the victim and the [petitioner] to the store and that she drove a white Impala at the time. She testified that her cousin, Justin Montgomery, was in the car with her. When she arrived at the house, she exited her car and knocked on the front door. She testified that the [petitioner] answered the door and said, "We straight." When Ms. Nichols asked where the victim was, the [petitioner] answered, "She straight. We good." Ms. Nichols testified that at that point, the victim walked out from the back of the house, and the [petitioner] stepped outside the house.

Ms. Nichols stated that she and the victim got into the Impala but that the [petitioner] pulled the victim out of the car. She said that "[w]hen he pulled her out of the car, the victim got away again and [the] [petitioner] pointed the gun at the victim." Ms. Nichols exited the car and tried to calm the [petitioner] and the victim down. According to Ms. Nichols, the [petitioner] "pointed the gun[,][a]nd when he pointed the gun, [she] got back in the car, and click, click, [the gun] didn't go off." Ms. Nichols returned to her car and watched as the [petitioner] "dragg[ed] the victim in the house" through the back door.

. . . .

Ms. Chambers testified that she heard the victim come back into the house and that she was calling, "Mom, mom." Ms. Chambers went into the victim's bedroom to see what was going on. She saw that the [petitioner] had the victim in the headlock and was holding a gun down by his leg. The [petitioner] was cussing the victim, calling her "b***hes" and "motherf**kers."

Ms. Chambers testified that she stepped in between the victim and the [petitioner] and that the [petitioner] released the victim from the headlock. The victim got behind Ms. Chambers, and the [petitioner] said, "B***h you think I won't kill you?" and "B***h give me my damn money." The victim raised her head up from behind Ms. Chambers's back, and the [petitioner] said, "B***h you think I won't kill you 'bout my mother**king money?" The victim responded, "Why?," and then the [petitioner] shot the victim "execution style, in her head."

The [petitioner] then looked at Ms. Chambers, "recocked" his gun, and pointed it at her. Ms. Chambers shoved the [petitioner] out of her way and ran out of her house and across the street to a neighbor's house. Ms. Chambers testified that neither she nor the victim ever touched the gun and that her grandchildren were standing in the doorway of the victim's bedroom when she was shot, that they saw what happened, and that they stayed in the house when she ran across the street. Ms. Nichols testified that she saw Ms. Chambers run out of the house saying, "Call the police. He killed my baby. He killed my baby."

. . . .

- 4 -

Latasha Davidson testified that Cynthia Poole is her mother and Felecia Swift is her aunt. She was living with her aunt, her mother, and her grandmother on April 11, 2011.

. . . .

[After recounting her version of events which was similar to that of Ms. Nichols], Ms. Davidson testified that she made the phone call to 911 and that Ms. Chambers said, "Call--call 911. He shot my baby in the head. He shot my baby in the head." She said that while on the phone, the police asked her what she saw, and she told them she saw "two kids standing in the door. Like just . . . terrified, just standing in the door." While Ms. Davidson was on the phone with police, the [petitioner] came out of the house and said "I told her, I told her, I told her, I told her. Man, I told her." Then, the [petitioner] said, "Better not be calling the police 'cause my folks the police." Upon hearing this, Ms. Davidson hung up the phone.

. . . .

Cynthia Poole testified that she was at home on the day of the shooting and that she was in her room when her sister, Ms. Swift, "holler[ed]" for her. She immediately went into her mother's room at the front of the house and saw Ms. Chambers run across the street. She testified that Ms. Chambers was "hysterical" and was saying, "He shot her. He shot my daughter. He shot her." At that point, Ms. Poole looked across the street and saw the [petitioner], whom she knew by the nickname "Bear," standing in the doorway of the victim's house. She also saw a "little bitty boy" standing in the doorway next to the [petitioner] and watched as the [petitioner] put a gun "on top of the little boy's head" while the "little boy was covering his ears, and . . . hollering." Ms. Poole testified that the [petitioner] then "pushed the little boy back" and shut the front door. Next, Ms. Poole saw the [petitioner] come outside the house with a gun in his hand. He waved the gun around and said, "I told her, I told her, I told her" before retreating back inside the house. Ms. Poole estimated that at the time these events occurred, she was about one hundred feet from the [petitioner] and stated that her view was unobstructed.

. . . .

Sergeant Thomas McDaniel testified that he was one of the first responders to the shooting on April 11, 2011. When he arrived at the victim's

- 5 -

house, he heard screaming from across the street and went over to investigate. He noticed a woman, later identified as Ms. Chambers, who was very upset and told him that her daughter had been shot by her boyfriend. Sergeant McDaniel then radioed the dispatcher that there was a person in the house with some children and that a woman had been shot. Sergeant McDaniel looked back across the street towards the house and saw a man open the door, look out, and then the man turned back around and closed the door. He testified that the police set up a perimeter around the house to ensure the safety of all involved and also to prevent escape. The Tactical Apprehension Containment Team (TACT) arrived on the scene, and the [petitioner] was eventually apprehended.

. . . .

Officer Davin Clemons testified that he was employed by the Memphis Police Department as part of the TACT unit and also that the [petitioner] was his first cousin. On April 11, 2011, Officer Clemons was at school when he received several phone calls back to back from his grandmother, the [petitioner], and his supervisor. He testified that his grandmother was "hysterical" and "nervous" and was "yelling" and "screaming," saying that the [petitioner] had shot his girlfriend. His grandmother also told Officer Clemons that the [petitioner] told her "that he blew that b***h [sic] brains out."

The [petitioner] called Officer Clemons and asked him to "come over [to the house] and get [the] [petitioner] out of the house," saying that he would not come out unless Officer Clemons was there and that he had "twenty minutes, to get over there . . . or he was going to hurt himself or . . . those kids." Officer Clemons went straight to the scene, arriving within twenty minutes, and stayed on the phone with the [petitioner]. He testified that he did not enter the house immediately upon arrival as per his supervisor's instructions. Officer Clemons said that the [petitioner] was afraid the police were going to shoot him if and when he came out of the house. Officer Clemons testified that the [petitioner] "didn't sound like [himself] on the phone." Officer Clemons told the other officers at the scene that he had "never known [the] [petitioner] to act this way."

. . . .

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that the victim's cause of death was a single gunshot wound

to the head, which would have been rapidly, if not immediately, fatal. In Dr. Chancellor's opinion, the gunshot was a contact wound, meaning that the barrel of the gun was touching the skin when it was fired. She made this determination based on "sooty residues" that were present on the edge of the wound, as well as inside the scalp tissue and on the outside of the skull where the bullet entered the brain. Dr. Chancellor testified that the presence of soot residue in these areas only occurs when there is a contact wound. On cross-examination, Dr. Chancellor agreed that there were no indications that the victim had lacerations on her head and also stated that when a person is struck by a blunt object, like a gun, the skin will break. She testified that the gunshot wound was the only head injury indicated on the autopsy report. On re-direct examination, Dr. Chancellor testified that blunt objects do not always leave lacerations but instead could produce a bruise or abrasion, or, if not much force was used, might not produce an injury at all.

The [petitioner] testified that he had been dating the victim for about one year before the "accident." When they first began dating, the [petitioner] was living in a duplex in Memphis, and the victim lived with him there for "a while." About four months before the shooting, the [petitioner] and the victim moved into the house on Lagena Street. The [petitioner] owned a gun before he met the victim, and he testified it was the same as that used to kill the victim. He said that he bought the gun for "protection" and "safety."

The [petitioner] testified that he and the victim had a place in their bedroom where they "stashed" their cash, which he estimated was about $1,000. On Friday, April 8, 2011, the [petitioner] removed the couple's cash from its usual hiding place because the victim had spent some of the money and he did not want her to take any more. The victim discovered that the money had been moved and called the police. When the police arrived, the victim told them that the [petitioner] had taken her money. The [petitioner] denied slapping the victim after the police left and testified that everything returned to normal between him and the victim by the next day.

The [petitioner] testified that on Sunday, April 10, 2011, he awoke to find that the victim had taken the money from their stash. He called the victim multiple times and also called Ms. Nichols, but neither answered. The [petitioner] said that he was "upset" that the money was missing. According to the [petitioner], the victim returned to the house around 6:00 p.m. that evening. He asked the victim where she had been and where the money was, and she replied that she had been with Ms. Nichols and that she had spent some of the money on a tattoo. The victim also told the [petitioner] that she

had allowed Ms. Nichols to "hold onto" the rest of the money. The [petitioner] testified that he and the victim went "back and forth" about the money, but the victim told him not to worry about it because she was going to get the rest of the money back. The [petitioner] again called Ms. Nichols, but she did not answer.

The [petitioner] testified that later that night everything had calmed down. He denied taking the victim to any park and also denied choking her "or anything like that." . . .

On April 11, 2011, the [petitioner] and the victim had plans to go buy a new phone, and Ms. Nichols was supposed to take them to the store to get the phone. The [petitioner] testified that when he got up that morning, he again asked the victim about how much money she had spent and how much was left. The victim told the [petitioner] not to worry about it and that they would get the money back. The victim then walked toward the back of the house.

The [petitioner] walked back into their bedroom and heard the victim outside on her phone. He told the victim to tell the person on the phone "that [the] [petitioner] was tripping on her over the money." When the victim came back inside, she told the [petitioner] that Ms. Nichols was going to take her somewhere and that Ms. Nichols would take both of them to the store later. At this point, the [petitioner] testified that he "started getting frustrated" and told the victim "that she was BS'ing" and that "if she'd just give [him] the money, [they could] split it up and he would leave." According to the [petitioner], the victim told him that "if he was going to leave, he would be gone already." Frustrated, the [petitioner] threatened to call the victim's parole officer and report that the victim was using cocaine and pills.

The [petitioner] testified that he went into the kitchen and got some paper to write a note. According to the [petitioner], he "didn't have no certain meaning when [he] wrote it. . . . [He] was just frustrated, and . . . trying to get [the victim] to take [him] serious, and . . . wanted her to think that [he] was going to do something to [himself]" so that "she would stop acting like she was acting." The [petitioner] testified that the victim walked by and grabbed the note, and the [petitioner] asked her to give it back. The victim took the note into Ms. Chambers's bedroom, and Ms. Chambers "snatched" it out of the victim's hand. Ms. Chambers read the letter and asked, "What y'all got going on?" The [petitioner] told Ms. Chambers that the victim had

his money, but the victim denied this was true. The [petitioner] testified that Ms. Nichols then entered the house and walked into the bedroom. Ms. Chambers asked Ms. Nichols whether the victim had given her any money, and Ms. Nichols responded that she had not. The victim then left the room and walked back into her bedroom, where she exited the house through the patio door.

The [petitioner] testified that he went into the bedroom after the victim and that he noticed the "comforter on the bed . . . was up . . . where [he] kept his gun." The [petitioner] exited through the patio door, and when he rounded the corner of the house, he saw the victim with the gun heading towards Ms. Nichols's car, which was parked in the driveway. According to the [petitioner], there were two men in Ms. Nichols's car: her boyfriend, Kevin Robinson, and another male, whom he later learned was her cousin, Justin Montgomery. The [petitioner] walked up to the victim, grabbed her by the arm, and took possession of the gun. Ms. Nichols then exited the house, got into her car, and began reversing out of the driveway. The victim asked Ms. Nichols to wait, but she "sped off out of the driveway in reverse."

The [petitioner] and the victim then walked back towards the house. The [petitioner] denied ever putting the victim in a headlock, although he did admit that he "was cussing and stuff like that, but how everything was happening, everything was a big frustration." The [petitioner] and the victim entered the house through the back patio door that led directly into their bedroom. According to the [petitioner], Ms. Chambers came into the room and asked him what he was doing "with that d**n gun" and told him to "[p]ut the d**n gun down."

The [petitioner] testified that Ms. Chambers walked toward him, "got right up on [him]," and grabbed his arm. Ms. Chambers "was slapping [his] hand, trying to get [him] to put the gun down." The [petitioner] testified that he did not put the gun down and that he and Ms. Chambers continued to struggle. According to the [petitioner], the victim was screaming, telling both Ms. Chambers and the [petitioner] to stop fighting. The [petitioner] testified that he was holding the gun in his right hand, Ms. Chambers was holding onto his wrist, and "[t]hen the gun went off." The [petitioner] "went in a state of shock" because he "knew [the victim] was gone."

The [petitioner] denied chasing Ms. Chambers out of the house. He testified that after the victim was shot he attempted to "unchamber" the gun and then placed the gun on the dresser. Ms. Chambers "struck out, running

out of the patio." The [petitioner] heard the victim's son calling his name from the hallway. He denied ever pointing the gun towards either of the victim's children and claimed the only time he touched the gun after the shooting was when Officer Clemons asked him where the gun was and told the [petitioner] to "[m]ake sure the gun [was] in another room." The [petitioner] then took the gun into Ms. Chambers's room and set it on the dresser. The [petitioner] claimed that he walked into the living room, with the children tagging along behind him, and looked out the door to see the first police car arriving.

According to the [petitioner], he was afraid because he saw the police outside with guns and he "didn't know what to do" and "couldn't think straight." He called his grandmother because she "was the first person that came to [his] mind when [he] picked [his] phone up." He told his grandmother that he shot the victim and asked her to call his cousin "to come get [him] before they kill[ed] [him]." He also called his cousin, Officer Clemons. Officer Clemons asked the [petitioner] whether the victim was dead and where the children were, and he then instructed the [petitioner] to close the bedroom door so that the children would not see the victim. The [petitioner] testified that he had no intention of hurting the children and that he did not remember saying he was going to hurt the kids but that he knew he must have said it because Officer Clemons had no reason to lie.

On cross-examination, the [petitioner] again denied that he had ever slapped the victim. He testified that he was "pretty sure [the victim] didn't tell [Ms. Nichols]" that he had threatened her before. He said that the only time an altercation between him and the victim "got physical" was before he moved into Ms. Chambers's house. He recalled that the victim had come to his house and saw another woman there, that the victim tried to fight him, and that he ended up "pushing her on the ground."

. . . .

The [petitioner] maintained that the victim was trying to pull Ms. Chambers away from him when the gun went off and that he never aimed the gun at the victim. He further testified that he "didn't have any control over the situation" and wished he would have just left the room instead of struggling over the gun with Ms. Chambers. The [petitioner] testified that he did not check on the victim or try to help her because "[it] was too late."

- 10 -

*State v. Darius Jones*, No. W2013-02010-CCA-R3-CD, 2015 WL 112793, at *1-10 (Tenn. Crim. App. Jan. 8, 2015), *perm. app. denied* (Tenn. May 18, 2015) (footnote omitted).

## II.     Post-Conviction Hearing

The petitioner subsequently filed a pro se petition for post-conviction relief alleging the ineffective assistance of trial counsel. The post-conviction court appointed counsel, and the petitioner filed two amended petitions. In doing so, the petitioner generally alleged that trial counsel failed to: (1) "[b]e adequately prepared for the case;" (2) "[f]ully investigate the circumstances surrounding the case;" (3) "[p]roperly communicate the factual and legal aspects of the case;" (4) [i]nvestigate and call all appropriate witnesses;" and (5) "[f]ile and litigate all appropriate motions." In addition, the petitioner alleged the following claims regarding the ineffective assistance of both trial and appellate counsel:

> Specifically [the] petitioner alleges that trial counsel was ineffective for failing to develop a proper strategy, fully investigate police and witness statements, request and investigate discovery, and properly explain all the evidence against [the] [p]etitioner in a timely manner. If trial counsel had properly prepared, [the] [p]etitioner would have received a fair trial.
>
> Trial counsel failed to properly communicate with [the] [p]etitioner regarding the 911 audio tapes and failed to secure those tapes within the normal retention time of the maintaining agency.
>
> Trial counsel failed to provide any closing argument in opposition to the kidnapping allegations, which ultimately resulted in the felony murder conviction.
>
> Trial counsel also failed to obtain pictures that were collected during the investigation and provide that discovery to [the] [p]etitioner in advance of trial.
>
> [The] [p]etitioner (sic) failed to do any sort of trial preparation with [the] [p]etitioner regarding his testimony.
>
> Trial counsel failed to properly communicate with [the] [p]etitioner and seek funds, an expert, or secure evidence regarding gun-shot-residue testing on the victim's hands.
>
> Appellate counsel failed to mention or argue the 404(b) ruling on appeal.

- 11 -

The post-conviction court held an evidentiary hearing to address the allegations on August 22 and 23, 2019, during which the prosecutor, trial counsel, and the petitioner testified.

The prosecutor began handling the petitioner's case in General Sessions Court in April 2011. At the time, the petitioner was represented by the public defender's office to whom the prosecutor provided a paper copy of the discovery in the petitioner's case. The prosecutor stated that trial counsel was not appointed to represent the petitioner until September 27, 2012, and as such, the prosecutor presumed trial counsel obtained the discovery file from the public defender's office. The prosecutor did not recall making a separate copy of the discovery for trial counsel.

Regarding the contents of the discovery, the prosecutor recalled that during the investigation, the Memphis Police Department ("MPD") took gunshot powder residue swabs from the petitioner's and the victim's hands. The swabs, however, were not tested. The prosecutor explained that "the test is relatively unreliable" and was irrelevant in this case as there was "an eyewitness standing in between [the petitioner] and [the victim] to tell [the prosecutor] who had the gun and what happened." Further, the prosecutor testified that Ms. Chambers stated the petitioner "put the gun around her shoulder to [the victim's] temple and pulled the trigger one time," and the petitioner did not dispute holding the gun. Based upon this evidence, the prosecutor expected there would have been gunshot residue on the victim because "if you are in a room when someone pulls the trigger, such as [the petitioner] putting that bullet in [the victim's] brain, you will more than likely have gunshot powder residue on you."

Regarding the 911 calls made after the shooting, the prosecutor stated he did not recall if the petitioner called 911 but did recall that the petitioner called his grandmother and cousin. The prosecutor reviewed a print-out of the February 22, 2013 request for the 911 audio recordings related to the shooting made by the district attorney's office and the MPD information request for all of the 911 calls made in relation to the shooting. Both documents were entered into evidence.

According to the prosecutor, the print-out showed that on the day of the shooting, MPD requested the audio recordings for any 911 calls made from the address where the shooting occurred. This request, however, was unsuccessful though the prosecutor did not know why and did not recall receiving audio recordings of any 911 calls in the petitioner's case.

The request made by the district attorney's office was also unsuccessful. The prosecutor explained that the request was made over eighteen months after the date of the shooting and as such, any recordings that did exist were no longer available. The prosecutor stated the request by his office was likely not made until February 2013,

- 12 -

"probably in preparation for trial," and indicated he was unaware of the eighteen-month policy at the time the request was made.

The petitioner also testified, stating trial counsel met with him approximately three or four times with each meeting lasting around thirty minutes. During the meetings, the petitioner recalled "going over statements of the witnesses," learning his trial had been reset, discussing whether the petitioner would testify during trial, and "explain[ing] to [trial counsel] that it was an accidental shooting." The petitioner also wrote trial counsel four or five letters but only received one response from trial counsel informing him of trial counsel's appointment "and that [trial counsel] had motions that he had filed on [the petitioner's] behalf."

Generally, the petitioner testified he and trial counsel did not discuss any defense strategies; therefore the petitioner felt like he went into trial "blind," "unprepared," and like trial counsel was depriving him of all of the favorable evidence to build his defense. Regarding discovery, the petitioner stated he received "a few documents" from his initial attorney, including a copy of the indictment, motions filed on the petitioner's behalf, witness statements, and transcripts of the preliminary hearing. However, as it relates to trial counsel, the petitioner stated he did not "receive any actual discovery until after my trial when I wrote the Board of Responsibility about not having any discovery to file my appeal." As a result, in April 2016, trial counsel mailed the petitioner "what [trial counsel] said was all he had dealing with [the petitioner's] case." The discovery file included transcripts of the preliminary hearing, a chronology of 911 calls, the investigator's reports, and witness statements. A copy of this discovery file was entered into evidence, and the petitioner stated he provided this discovery to post-conviction counsel but was unsure if any documents were missing from the discovery.

The petitioner next identified twenty-seven photographs, each of which was entered into evidence during the petitioner's trial, and the photographs of the trial exhibits were entered into evidence during the evidentiary hearing. According to the petitioner, trial counsel did not review the trial exhibit photographs with him before trial.

The petitioner also discussed the handwritten note that was introduced during trial. The petitioner stated he had not seen the note prior to trial and did not discuss the note with trial counsel other than trial counsel's asking him who wrote the note and why Ms. Chambers would claim the victim wrote the note.

Regarding the 911 tapes, the petitioner stated he called 911 after the shooting. As he and trial counsel discussed the indictment, the petitioner stated, "'Man, it's impossible for them to have got me for kidnapping the kids when I was on the phone with the dispatcher for 30 minutes in the house while I was inside of the house.'" However, when

the petitioner asked trial counsel to obtain the 911 recordings upon trial counsel's appointment, trial counsel stated, "'Well, you didn't call 911. The people across the street called 911.'" After this discussion, the petitioner believed trial counsel "ignored everything [he] said about the 911 calls or anything of that nature." The petitioner believed his 911 call would demonstrate "that it wasn't a kidnapping, that I was not holding the kids against they will inside of the house."

In addition, the petitioner disputed his trial testimony concerning the call he made to his grandmother after the shooting, stating that he actually called 911 before calling his grandmother and he did not tell his grandmother that he "blew" the victim's "brains out." The petitioner explained he did not tell the jury that he called 911 during his trial testimony because he was "overwhelmed" and "couldn't get all this stuff out." Referring to the trial transcript, however, post-conviction counsel noted the petitioner did in fact testify that he called 911 after the shooting. The petitioner then also agreed that he called his grandmother and asked her to call his cousin, Officer Clemons. The petitioner stated he also called Officer Clemons while on the phone with 911 dispatch and the police were outside the home. The petitioner denied telling Officer Clemons that he would hurt the victim's children if Officer Clemons did not arrive soon. Ultimately, the petitioner acknowledged that he testified during trial that he was on the phone with 911 when Officer Clemons arrived but did not agree that he testified about the conversation he had with dispatch.

The petitioner explained his claims of ineffectiveness against trial counsel regarding a potential witness, Mr. Clark,[3] who was quoted in a newspaper article that the petitioner received in the discovery file after trial, as follows:

> So Mr. Clark said something that was consistent with what I said, that it was an accidental shooting. You know, I didn't -- I didn't have [the victim] in a headlock. She was attached to me, trying to calm me down. And that's what -- if he said that -- it was consistent with what I said -- the jury might have accepted what I said happened. And they -- you know, it would have been probably in my favor and I would have had a different outcome at trial.

Regarding the gunshot residue swabs, the petitioner stated that his hands were swabbed after being arrested and that he learned the victim's hands were swabbed upon receiving the discovery file after trial. The petitioner believed the swabs needed to be tested in order "to determine who all hands was on the gun when the gun went off." The petitioner explained that "if the results show that [the victim] had gunshot residue on her

_____

[3] The record is absent additional evidence regarding the substance of the alleged testimony that Mr. Clark would have offered during trial or the newspaper article which forms the basis of the petitioner's claim.

- 14 -

hands as well, that's my proof that [the victim's] hands and all three of our hands was on the gun as well." According to the petitioner, however, trial counsel told him that a gunshot residue expert would not be permitted during trial.

The petitioner discussed hiring a gunshot residue expert with post-conviction counsel, who provided the petitioner with a quote from the expert for the cost to complete the tests and provide in-court testimony. But, the post-conviction court denied the petitioner's request for expert funding, and the petitioner was unable to obtain other funds to hire the expert.

At this point in the hearing, the post-conviction court allowed the petitioner to detail numerous, additional allegations of ineffectiveness against trial counsel that were not specifically raised in his petition. The petitioner's additional claims of ineffectiveness included, in part, trial counsel's alleged failure to call witnesses, effectively cross-examine witnesses, present evidence in his defense, or challenge the indictment. Though the post-conviction court permitted the petitioner's testimony "out of an abundance of caution," it also stated that "the [post-conviction] [c]ourt has agreed that there's not been an amended petition that was filed" in relation to these claims.

During this portion of the hearing, the petitioner also disputed the testimony at trial regarding prior threats he made against the victim. The petitioner explained:

As well as a statement that Ms. Chambers or one of the witness under the prior -- acts of prior acts of wrongdoing that they entered, they said that I that the witness had -- or the victim had said that I threatened to kill her or something like that. The witness -- the -- I mean the victim is deceased. The witness is not here to testify to these things. They making this stuff up. So how would these statements enter into [] evidence for the jury to hear? And all that prejudice me because it put a picture in they head that oh, he did this. He did this on purpose. He meant to do this.

Regarding his appeal, the petitioner generally stated that he did not know what issues appellate counsel raised because appellate counsel did not "afford[]" him any "proof."

The petitioner further stated that he only testified during trial because trial counsel explained that would be the only way to get the petitioner's side of the story presented to the jury. Thus, trial counsel "convinced [the petitioner] to testify thinking that it was going to help me." The petitioner claimed trial counsel did not prepare him to testify at trial, and his decision to testify was a "bad" one because "the prosecutor switched a lot of things up that I said and confused me and I don't feel like I was prepared." The petitioner

- 15 -

acknowledged he was in the room when the gun fired and "[t]he gun was in all three of our hands."

Finally, trial counsel testified, stating he has practiced law since 1997 and had handled in excess of forty murder trials prior to representing the petitioner. When he was appointed to the petitioner's case in 2012, the case was already set for trial. As such, trial counsel "acquired the discovery materials, [] reviewed the discovery materials, [] obtained an investigator, and prepared for trial." In doing so, trial counsel met with the petitioner four or five times in jail and twice in the courtroom for a total of approximately four to six hours. However, meeting with the petitioner was "[n]ot very important" to trial counsel because the petitioner "wasn't particularly articulate or very helpful, he had anger issues, and wanted an offer of 15 years."

Regarding the 15-year offer, trial counsel approached the prosecutor but the offer was "flatly rejected." As a result, the petitioner "became angry," and trial counsel stated that "speaking with [the petitioner] was not a productive use of [trial counsel's] time." Trial counsel also recalled that the petitioner wrote to him "fairly frequently" while the petitioner was in jail but did not recall how many times he responded to the petitioner's letters.

Trial counsel reviewed the bill he submitted to the State for his attorney's fees, a copy of which was entered into evidence, and agreed that based upon his billing record he spent approximately 251 hours on the petitioner's case. Trial counsel also reviewed a document showing the times he and initial counsel visited the petitioner in jail. The document was entered into evidence and showed trial counsel visited the petitioner four times.

Regarding the discovery, trial counsel explained that when he began representing the petitioner, he assumed the petitioner already had a copy of the discovery which consisted of approximately two hundred pages. Trial counsel, however, did not recall providing or not providing the discovery to the petitioner though he did recall providing the discovery to Rachel Geiser, the court-appointed investigator. Trial counsel thought the petitioner's case file was lost when he moved offices in 2014, and it was possible he mailed the petitioner his file upon the petitioner's request after trial. In reviewing the discovery file entered into evidence during the hearing, trial counsel stated the file was missing supplements from Ms. Geiser, and "[t]here may be other documents that are missing." An email sent from post-conviction counsel to trial counsel regarding the petitioner's case file, which consisted of 284 pages, was also entered into evidence.

Regarding the defense theory at trial, trial counsel explained that based upon the facts of the case, there was not "a viable theory of defense" as to the petitioner's first-

degree murder charge and told the petitioner that they did not "really have a defense." As to the kidnapping charges concerning the victim's children, trial counsel stated the defense theory "was that it was not a kidnapping" but "we didn't really have a defense." Regarding the defense theory for the especially aggravated kidnapping of the victim, trial counsel stated, "our theory was that, again, it was not a kidnapping. We tried to convince the jury that it was more of a struggle rather than a kidnapping, but I don't believe that to have been a very viable defense." Regardless, trial counsel attempted to illicit testimony to show "there was (sic) no injuries relating to a pistol-whipping" in order "to maybe undermine that witness's testimony that [the petitioner] had beaten [the victim] about the head with the gun." Ultimately, trial counsel stated: "The facts, looking back, were fairly clear. We tried to make mountains out of mole hills, so to speak. . . . We succeeded to a certain extent, and that's how [the petitioner] was convicted of second[-]degree murder in the premeditated count. That's how he was convicted of reckless endangerment in the attempted murder count." However, trial counsel noted "there was no getting around the idea that [the petitioner] had held [the victim] and put a gun to her head."

Furthermore, trial counsel stated, "[t]here were no surprises" at trial and there were no witnesses of whom he was aware that were unavailable for trial. Trial counsel did not recall when he obtained crime scene or autopsy photographs but stated he did not provide any photographs to the petitioner and did not spend much time reviewing the photographs as they were "graphic" and "troubling" and the case did not hinge on the photographs. Regarding the handwritten note introduced at trial, trial counsel recalled "some discussion about whether the note was a suicide note or not, but it doesn't really stand out." Trial counsel emphasized that the photographs and the note "were not the issue in this case. The issue in this case was whether [the petitioner] had kidnapped [the victim] and the children and whether he had killed [the victim] during the perpetration of that kidnapping."

Trial counsel also discussed the 911 audio recordings and the gunshot residue swabs. Trial counsel did not recall whose hands were swabbed, he did not know why the swabs were not analyzed during the investigation, and it was not important to trial counsel in which hand the petitioner held the gun. Trial counsel explained: "I would have assumed that both [the victim] and [the petitioner] would have had gunshot residue, but I'm not an expert." Trial counsel also did not recall if he discussed the gunshot residue swabs and lack of testing with the petitioner, he did not discuss hiring a gunshot residue expert with the petitioner, and he did not petition the court for expert funds in this case. Trial counsel also did not recall listening to any 911 audio recordings and did not attempt to obtain any 911 audio recordings because the 911 call "wasn't what the case would rise and fall on" though trial counsel did review a "911 log."

Regarding the petitioner's decision to testify, trial counsel explained that the case did not rest with the petitioner's testimony and as such, it was "[n]ot very" important to

trial counsel to prepare the petitioner as he did not believe the petitioner would make a good witness due to his anger issues. Upon questioning from the post-conviction court, trial counsel stated the petitioner made the decision to testify, noting "[i]t was completely his decision."

During cross-examination, trial counsel stated he did not recall how many pages the petitioner's file contained. However, trial counsel was not surprised by any evidence presented during trial and believed he received all of the discovery from the State. Regarding the available strategies for the defense, trial counsel stated "[t]here was no mental health defense" and "[t]here was no controversy about what had happened or who did what. The question was why." Trial counsel also noted that Ms. Geiser's investigation "did not support an accidental shooting" nor did the close contact wound to the victim's head. As such, trial counsel presented the theory that the shooting was an accident through his cross-examination of Ms. Chambers and the defendant's testimony, noting that the defendant's demeanor "was not helpful."

Furthermore, trial counsel stated that whether the defendant called 911 after the shooting was not important but recalled questioning the petitioner during trial about the 911 call and the petitioner's intent not to harm the children. Trial counsel also explained he likely would have been unsuccessful in obtaining the 911 recordings as he was appointed to represent the petitioner approximately eighteen months after the shooting and the recordings were only maintained for a period of eighteen months.

Trial counsel did not think expert services were necessary to support the defense. Specifically, trial counsel did not think he would have been successful in obtaining a gunshot residue expert because trial counsel believed "that everyone would have been covered with gunshot residue, given how close the shot was. Plus, [the victim] was shot in her head. I don't think she would have accidentally shot herself at close range in her head."

After arguments by the parties, the post-conviction court orally denied the petition and issued a written order denying relief on November 14, 2019. In the written order, the post-conviction court made the following findings for the purpose of appellate review: (1) "[t]he [p]etitioner failed to produce the 911 operator to show how the phone call could have made any difference in his trial;" (2) "[t]he [p]etitioner failed to produce any witnesses referenced in news reports;" (3) "[t]he [p]etitioner failed to produce any witnesses whom the [p]etitioner believed were helpful in contradicting the State's proof;" (4) the petitioner failed to show how trial counsel was ineffective in his communication with the petitioner; (5) "the [p]etitioner has not shown how additional experts would have been beneficial to the petitioner's defense;" (6) "the [p]etitioner has failed to prove how he was prejudiced by the negligent destruction of [the] 911 tape recording;" (7) "[t]he decision of the

[p]etitioner's appellate counsel to only include those issues that he believed was meritorious in a motion for new trial and in the Rule 11 application is a proper tactical decision;" (8) "all other issues, for which evidence has not been presented at the evidentiary hearing, have been waived;" and (9) "[t]he [p]etitioner has wholly failed to establish any deficiency by trial or appellate counsel." The petitioner timely appealed.

## *Analysis*

On appeal, the petitioner contends the post-conviction court erred in finding he received the effective assistance of both trial and appellate counsel. Specifically, the petitioner argues trial counsel was ineffective for failing to adequately communicate with him, failing "to seek a *Ferguson* instruction for [the] destroyed 911 tapes and gunshot residue testing," and failing to investigate additional witnesses and "other issues." The petitioner asserts appellate counsel was ineffective for failing "to appeal the admission of prior bad acts under [Tennessee Rules of Evidence Rule] 404(b)." The State submits the petitioner has failed to meet the burden required of him, and therefore, is not entitled to relief. Upon our review of the record and the applicable law, we affirm the ruling of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I. Trial Counsel

### a. Communication and Preparation

The petitioner asserts the post-conviction court erred in denying his petition because "[t]rial counsel's inadequate communication prejudiced the outcome of [the] [p]etitioner's trial." In support of this claim, the petitioner argues that trial counsel "billed over 250 hours to the State on this case, and less than five of those hours included direct or indirect communication with [the] [p]etitioner" and "[t]rial counsel logged over three hours reviewing pictures, but then never shared those pictures with [the] [p]etitioner." The petitioner further asserts that trial counsel's "lack of communication impacted the trial globally, in [the] [p]etitioner's decision to testify and in the quality of the testimony itself." In response, the State contends that "some of the petitioner's factual claims are contradicted

by the record, the post-conviction court found others not to be credible, and the petitioner has failed to point to any particular way in which any particular lack of communication or preparation affected his decision to testify, his testimony, or the outcome of his trial." Upon our review, we agree with the State.

The record indicates trial counsel was appointed to the petitioner's case after it had been set for trial. Upon his appointment, trial counsel obtained and reviewed the discovery, utilized an investigator, met with the petitioner numerous times, discussed the petitioner's theory of the case with the petitioner, and prepared a corresponding defense. The record shows trial counsel visited the petitioner four times in jail and twice in the courtroom, and the petitioner testified he met with trial counsel several times. During these meetings, the petitioner and trial counsel discussed the indictment, the witness statements, the handwritten note presented at trial, the petitioner's "accidental shooting" defense theory, the 911 call the petitioner made and its relation to the kidnapping charges against the victim's children, and whether the petitioner would testify during trial. In addition, trial counsel testified that he took the petitioner's request for a 15-year guilty plea offer to the district attorney's office, the offer was rejected, and the petitioner became angry. As a result, trial counsel explained that communicating with the petitioner was no longer helpful as he prepared for trial. Regardless, trial counsel presented the petitioner's defense theory to the jury through both his cross-examination of the State's witnesses and the petitioner's testimony. And, in trial counsel's opinion, the defense was relatively successful as the petitioner was convicted of several lesser-included offenses against his victims. While trial counsel admittedly encountered difficulties in communicating with the petitioner, largely due to the petitioner's anger issues, the record demonstrates that trial counsel engaged in adequate communication with the petitioner throughout his representation. Furthermore, nothing in the record indicates that trial counsel failed to adequately prepare for trial as it is clear trial counsel met with the petitioner numerous times, reviewed the discovery, worked with an investigator, and logged over 250 hours on behalf of the petitioner in preparing the defense. Therefore, we conclude the petitioner has failed to establish that trial counsel's communication or preparation was deficient. *Goad*, 938 S.W.2d at 369. The petitioner is not entitled to relief.

Within this claim, the petitioner also asserts that he "felt forced to testify" at trial, he was not prepared to testify, and he "only testified because trial counsel and the trial court told him that any other evidence he had to corroborate his version of events would be hearsay." However, trial counsel explained that he presented the petitioner's defense theory to the jury through his cross-examination of the State's witnesses and that he in no way forced the petitioner to testify. Instead, trial counsel advised the petitioner against testifying, and the petitioner admits in his brief that trial counsel "thought it was a bad idea for [the] [p]etitioner to testify." Trial counsel also stated that the petitioner's testimony was not essential to the defense and that he did not think the petitioner would make a good

witness. Furthermore, the record indicates the trial court conducted a *Momon* hearing after which the petitioner chose to testify on his own behalf. Though the petitioner claims trial counsel forced him to testify, trial counsel denied this assertion, and the post-conviction court accredited trial counsel's testimony over that of the petitioner. Nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d 500. Accordingly, the petitioner cannot meet his burden of showing how trial counsel was deficient as to this issue. *Goad*, 938 S.W.2d at 369. The petitioner, again, is not entitled to relief.

### b. *The 911 Tapes and Ferguson Instruction*

The petitioner also argues trial counsel was ineffective for failing "to obtain evidence or request a missing evidence jury instruction pursuant to *Ferguson*." Specifically, the petitioner asserts "the 911 tapes destroyed eighteen months after the beginning of the [S]tate's investigation and shortly after the appointment of trial counsel were essential to the defense because they would have portrayed [the] [p]etitioner's demeanor in the immediate aftermath of the shooting" and "would have supported [the] [p]etitioner's theory of an accidental shooting, and perhaps would have obviated the need for [the] [p]etitioner to testify." The petitioner argues that "[o]nce trial counsel determined that the recordings had been destroyed, he should have requested a *Ferguson* instruction from the trial court" as the instruction "would have told jurors that the absence of the tapes is not a coincidence or accident, but rather should arouse some suspicion that the tapes went missing because they could in fact be exculpatory." The petitioner argues that "[b]ut for trial counsel's error, the jury would have been directed toward a gaping hole in the state's case, and would likely have returned a lesser-included verdict." We disagree.

Initially, we note, the petitioner raises the claim that trial counsel was ineffective for failing to request a *Ferguson* instruction regarding the unavailable audio recording of the petitioner's 911 call for the first time on appeal. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. Tenn. Code Ann. § 40-30-104(d); *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). Accordingly, this issue is waived, and the petitioner is not entitled to relief.

As it relates to trial counsel's alleged ineffectiveness for failing to obtain the audio recording of the petitioner's 911 call, the post-conviction court stated: "At the time this case was set for trial, the tape had already been destroyed. The State was under no duty to preserve the 911 tape, as the call had no apparent exculpatory value at the time the tape was routinely destroyed by the 911-call center." As noted, the record indicates the 911 recordings related to the shooting in this matter were destroyed prior to trial in accordance with the policy of the Memphis Police Department wherein recordings

are destroyed after eighteen months. Trial counsel's appointment coincided with the eighteen-month policy, and the record shows the State did not separately retain any 911 recordings related to the shooting. As a result, there were no recordings available for trial.

Because the 911 recordings had been destroyed and no longer existed, the petitioner cannot establish deficient performance or prejudice. Furthermore, trial counsel explained that the audio recording of the 911 call "wasn't what the case would rise and fall on," and the record indicates the petitioner testified about the 911 call during trial. Accordingly, the petitioner's claim is without merit, and the petitioner is not entitled to relief.

### c. Witnesses

#### i. Gunshot Residue Expert

The petitioner argues trial counsel was ineffective for failing to "require the State to test the gunshot residue swabs, have the swabs tested, or request funds for testing." The petitioner claims "[w]ith a critical fact discrepancy of who had who's hands on the gun at discharge, the [p]etitioner's trial outcome was prejudiced because the jury was unable to consider whether the presence of gunshot residue on the victim's hands was inconsistent or corroborating with the conflicting testimony." The State contends the post-conviction court properly denied this claim because the petitioner failed to present "any expert to testify at the post-conviction hearing about the results of the gunshot residue testing." We agree with the State.

Here, the petitioner has failed to establish how trial counsel's failure to have the swabs tested or to retain a gunshot residue expert resulted in deficient performance or prejudice. Both trial counsel and the prosecutor testified that gunshot residue testing is unreliable, and they assumed, based upon discussions they had with gunshot residue experts, that the petitioner, the victim, and Ms. Chambers all would have had gunshot residue on their person as a result of the close contact wound and their physical proximity to one another when the petitioner fired the gun. In addition, trial counsel testified that not only did the defendant admit to holding the gun, but also Ms. Chambers testified that the petitioner fired the shot that killed the victim.

The petitioner acknowledges that he did not produce a gunshot residue expert at the evidentiary hearing, noting he "was unable to obtain funds for [gunshot residue] testing because the post-conviction court denied [his] request." However, in *Davis v. State*, 912 S.W.2d 689, 696 (Tenn. 1995), our supreme court explained that "[a] person's right to counsel ends at the conclusion of the first stage of direct appeal" and that "[i]n the absence of a Constitutional right to counsel, there can be no Constitutional right to support services at state expense." But, in order "[t]o succeed on a claim of ineffective assistance of counsel

for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* By failing to produce a gunshot residue expert at the hearing, the petitioner has failed to present evidence to meet the burden required of him. Accordingly, the petitioner cannot show that trial counsel was deficient by not obtaining gunshot residue testing or a gunshot residue expert. The petitioner is not entitled to relief.

### ii. Witness Listed in a Newspaper Article

The petitioner also argues trial counsel was ineffective for failing to "investigate potential witnesses that were listed in a newspaper article in the possession of trial counsel, but never provided to [the] [p]etitioner." The petitioner asserts "[t]his lack of investigation by trial counsel prejudiced the [p]etitioner's trial outcome because the statement made to the newspaper conflicted with witness testimony used against [the] [p]etitioner, and therefore would be favorable to [the] [p]etitioner."[4] As noted above, in order "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant*, 263 S.W.3d at 869 (citing *Black*, 794 S.W.2d at 757. Because the petitioner failed to present any witnesses to support this claim, the petitioner has not met his burden, and this issue is without merit.

### iii. Other Issues

Finally, in his brief, the petitioner states: "[The] [p]etitioner also listed many other issues in his pro se petition that he explained further through his testimony that he wants the Court to consider." We, however, decline to do so as the petitioner has failed to provide any argument supporting the "other issues" alleged and has failed to cite to any authority in support of these "other issues." Tenn. R. App. P. 27(a)(7); 27(h). The petitioner is entitled to no further relief for claims of ineffectiveness alleged against trial counsel.

## II. Appellate Counsel

---

[4] The record is absent any evidence to support this claim other than the petitioner's testimony that a witness made a statement to a newspaper that corroborated the petitioner's claim that the shooting was accidental. The petitioner, however, failed to detail the alleged witness statement, provide the newspaper article upon which this claim relies, or explain how the alleged witness statement corroborated his defense theory.

The petitioner argues appellate counsel was ineffective for failing to appeal "the trial court's admission of prior acts of violence between [the] [p]etitioner" and the victim in violation of Rule 404(b), asserting "but for [appellate counsel's] deficiency, it is likely that [the] [p]etitioner would have already been granted a new trial." The State submits the post-conviction court correctly determined that appellate counsel provided effective assistance as this "issue lacked merit, because the trial court properly found that the evidence was admissible, and appellate counsel was not ineffective for failing to raise a meritless issue." We agree with the State.

The test used to determine whether appellate counsel was constitutionally effective is the same test applied to claims of ineffective assistance of counsel at the trial level. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Carpenter*, 126 S.W.3d at 887. The petitioner satisfies the prejudice prong of the *Strickland* test by showing there is a reasonable probability, or "a probability sufficient to undermine the confidence in the outcome," that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887 (*citing King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999)). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Id.* Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

- 25 -

Here, the petitioner claims that appellate counsel was ineffective for failing to appeal the admission of 404(b) evidence at trial. However, the petitioner has offered no evidence to support this claim. Rather, the petitioner testified generally that "Ms. Chambers or one of the witness[es]" testified that "the victim had said that [the petitioner] threatened to kill her or something like that," and the petitioner questioned the admissibility of this testimony. But, the petitioner also stated that he was unaware of what issues appellate counsel raised on direct appeal and provided no evidence to show how the allegedly inadmissible 404(b) evidence prejudiced his trial. The post-conviction court held the admissibility of the 404(b) evidence was fully litigated at the trial stage, and the record is absent any evidence to support the petitioner's claim against appellate counsel. Absent any evidence, the petitioner cannot meet the burden of proving his allegation against appellate counsel by clear and convincing evidence and cannot succeed in his ineffective assistance claim. *Strickland*, 466 U.S. at 687; Tenn. Code Ann. § 40-30-110(f). The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based on the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
J. ROSS DYER, JUDGE